## SUPREME COURT—APP. DIVISION—FIRST DEPT.,

### June 2, 1911.

## THE PEOPLE v. ISIDORO CAMPISI.

### (145 App. Div. 264.)

(1.) EXTORTION—THREAT TO KILL—EVIDENCE.

Evidence upon the trial of an indictment charging the defendant with feloniously obtaining money from one R. by means of threatening through letters that in case the sum was not paid R.'s son would be killed, examined, and *held*, that a judgment of conviction for the crime of extortion should be affirmed.

(2.) SAME—TRIAL—CHARGE.

Requests to charge that if any part of the money was paid over before the threat to kill was made there could be no conviction are properly refused where they have no application to the facts shown and entirely disregard the question of defendant's liability for sending the threatening letters.

APPEAL by the defendant, Isidoro Campisi, from a judgment of the Court of General Sessions of the Peace in and for the county of New York, rendered against the defendant on the 19th day of January, 1910, convicting him of the crime of extortion.

*John Palmieri,* for the appellant.

*Robert S. Johnstone,* for the respondent.

DOWLING, J.:

The indictment charged in substance that on November 28, 1908, in the city of New York, the defendant feloniously obtained from Guiseppe Randazzo the sum of $350 by the wrongful use of fear that in case the said sum was not paid Salvator Randazzo, the son of Guiseppe, would be killed.

It appears that Randazzo was living with his son at 36 First avenue in New York city in the month of October, 1908, when the boy asked for a penny to go out and get some candy, and,

having gone, did not return. Some time thereafter he began to receive letters containing threats that if he did not pay money for the return of his son, the latter would be killed, and the body thrown "in a box behind the door." Having shown some of the letters to one Adrogna, the latter advised him to speak to his brother-in-law, meaning defendant. This advice he followed, and asked defendant to go around and look for the child, in response to which the latter said that he knew nothing about it. About November 14th Randazzo delivered four of the letters received by him to the defendant, at the latter's request, that he might read them, but he never returned them, and when questioned concerning them replied that he had burned them up. Thereafter defendant told Randazzo that if he would give him $350 he would get his son back, as defend-' ant had found out where the boy was. Randazzo had only $200, which was in his wife's possession, but said if defendant would give him time he would borrow the money, which he did, obtaining the balance of $150 from another brother-in-law, Scarito. Thereafter, on November 27th, the sum of $350 was paid over to defendant by Randazzo, and while the money was being counted out to him, or while it was still in the defendant's hands, and before he had put it into his pocket, he told Randazzo that if he told anyone that he had given defendant the money they "would kill me and all the family." Defendant at that time promised that Randazzo's son would be home the following night. On the following evening, November 28th, at 8.30 P. M., the boy was found wandering alone on the street at the corner of King and Macdougal streets, about two miles from his home, to which he was restored on the following morning, after he had been taken by the citizens who found him to the police station. Thereafter the defendant called at Randazzo's house, but made no inquiry as to how the boy had been found nor when he had returned.

The foregoing facts could all have been found by the jury to

have been properly proven, established as they were by the testimony of Randazzo, his wife, Scarito and Gonsaph. They disclose the situation which has now become familiar of the kidnapping of the child, the sending of threatening letters to the parents demanding money or as an alternative the death of the child, the appearance of a person, following the receipt of the letters, who claims to know the child's whereabouts, and, if the money is paid over, the return of the child.

In this case there is the significant fact in no way sought to be explained, that the child made his appearance upon the street at the time fixed by defendant for his return to the father.

Defendant denied all the testimony tending to connect him with the detention or return of the child and attributed his prosecution to his failure to pay money to Randazzo upon demand. He claims never to have seen the letters in question and never to have received any money from Randazzo. Corroboration of his testimony was sought in that of his wife and brother, and two witnesses vouched for his good character.

There was a clear and direct issue of fact which was fairly submitted to the jury. Upon the testimony they might properly have found either that the threatening letters had been sent under the direction of defendant, if he did not write them; or that he was acting in conjunction with those who did write them. In either event he would have been guilty of extortion. (People v. Adrogna, 139 App. Div. 595.)

The only exceptions are those which have to do with the refusal upon the part of the court to charge certain requests of the defendant and with the exclusion of an alleged agreement in writing by defendant to purchase a one-half interest in a barber shop at 36 First avenue. As to the requests to charge they disregard entirely the question of whether or not the defendant was liable for the sending of the letters in question and proceed upon the theory that, if any part of the money had

been paid to defendant before the threat to kill Randazzo's family was made, even though the balance of the money was still being paid over, as the threat was simultaneous with the payment of the money there could be no conviction. In view of the facts in this case such requests were not proper and had no application thereto. The agreement to purchase was entirely immaterial and had no relevancy to any issue in the case and the defendant had been allowed, without objection, to testify regarding the alleged purchase of this interest in the barber shop, which could not have assisted the jury in reaching a conclusion upon the merits.

The defendant had a fair trial, and while some of the evidence of the witnesses for the prosecution was, as to some minor points, vague and contradictory, that was doubtless due to the fact that their testimony was given through an interpreter and their lack of education led them into apparent discrepancies; but the main facts having once been resolved by the jury to be as testified to by the witnesses for the prosecution, they could have led to no other reasonable inferences save that of defendant's guilt.

The judgment of conviction is, therefore, affirmed.

INGRAHAM, P. J., CLARKE, SCOTT and MILLER, JJ., concurred.

Judgment affirmed.

____

## NOTE ON KIDNAPPING.

GENERAL OBSERVATIONS.

Kidnapping is defined by Blackstone as the forcible abduction or stealing away of a man, woman or child from their own country and sending them into another.

The Penal Code, § 211 (Penal Law, § 1250) has much enlarged this definition.

It was an offense at common law, punishable by fine and imprisonment.

The earlier New York cases are confined to the kidnapping of negroes.

The crime may be committed by the use of actual physical force, or by coercion or fraud, although if the injured person is above the age of twelve years, and freely consents to the abduction, no offense is, in the absence of fraud, coercion or duress, committed.

## STATUTES.

The subject is now regulated by the Penal Law, sections 1250 to 1255 (Penal Code, sections 211 to 216).

Section 1250 Penal Law, which see, defines the crime under the New York statutes.

## HELD TO BE KIDNAPPING.

In Thompson's Case (1817 Gen. Sess.) 2 City Hall Rec., 120, it appeared that under the statutes "to prevent kidnapping of free people of color" passed 25th of February, 1813 (2d vol. R. S. 209), it was enacted that kidnapping or inveigling any person of color, not being a slave, with intent to send him out of this State against his will, or conspiring with others to commit said offense, should be punishable by fine or imprisonment, or both, in the discretion of the court, and by a subsequent act passed March 31st, 1817, the above section was re-enacted (omitting the words "not being a slave") in the 29th section of the latter act, the 13th section of which also provided that if any person should send to sea, or export or carry out of the State any slave or servant he should forfeit the sum of $500. And it was held that an indictment under the 29th section for inveigling six colored people on board a vessel with the intention of carrying them out of the State against their will, was sustainable, whether they were slaves or servants, or not.

In Pulford's Case (1819 Gen. Sess.) 4 City Hall Rec. 172, the prisoner was indicted under the 29th sec. of the act of 1817 for inveigling and kidnapping a female negress with intent to send her out of the State, and it was held that it was not necessary to prove that force was employed, or that the woman was taken against her will. To constitute kidnapping, or inveigling, no force was necessary; for, no doubt, these terms import any inducement by fraud or covin, calculated to accomplish the object against which the statute was passed.

When it appeared that one alleged to be a fugitive slave had been arrested without legal process, and instead of being taken before the proper

judicial officer to adjudicate upon the claim of his master, which action might have justified his arrest, he was taken to a retired place by the seaside, and kept there for thirty-six hours, and then removed to another place, a strong *prima facie* case is made out against the person making such arrest, of an intention to violate the statute against kidnapping, and as it is the duty of even private persons to arrest any one in the act of committing a felony, the act of police officers in taking into custody the person who had made such arrest, just as he released his prisoner, was justifiable, and a charge of assault and battery and false imprisonment against them could not be sustained. People v. Wolven (1848), 2d Ed. Sel Cas. 108.

In Hadden v. People, 25 N. Y. 373, it was held that procuring the intoxication of a sailor, with the design of getting him on board a ship, without his consent, and thus taking him on board, was kidnapping, within the meaning of 2 Rev. Stat. p. 664, section 28 (which is substantially re-enacted in section 1250, Penal Law), as much so as if it had been done by force, overcoming his resistance when in full strength, and it was held immaterial whether the prisoner did the acts in person, or advised them to be done; and it was further held that if the prisoner's intent and expectation was that the sailor should be carried against his will to Liverpool, or elsewhere out of the State of New York, the offense was complete, although the ship was not in fact destined for Liverpool or elsewhere out of the State.

The arrest of a person within this State by a sheriff of another State, even though the latter acts under a bench warrant issued by a judge of that State, is unauthorized, and such arrest, made for the purpose of forcibly abducting the arrested person from the State, followed immediately by such abduction, is a criminal offense both at common law and by statute (2 Rev. St. 664, § 28), Mandeville v. Guernsey, 51 Barb. 99.

In that case an action was brought against the sheriff for assault and battery and false imprisonment in making the arrest.

In People v. Frink, 41 Hun, 188, it was held that as it appeared that a warrant issued by a judge of the Supreme Court charged a felony against the relators in having in violation of section 211, Penal Code, unlawfully detained a child under twelve years of age with the intent of concealing it from its guardian, it was erroneous for another judge of the Supreme Court on return of habeas corpus, to discharge the relators on their giving bail, as the justice who issued the warrant had exclusive jurisdiction over them.

In People v. DeLeon, 47 Hun, 308, it was held to be a violation of Penal Code 211, subd. 1, to inveigle a woman out of the State to Panama.

on pretense of procuring her employment as a nurse or lady's companion, when it appeared that the real object of defendant was to transport her thither for the purpose of prostitution, and it was further held that section 213 of the Penal Code was only intended to apply to cases which did not necessarily involve the consent of the person entrapped.

This case was affirmed in 109. N. Y. 226, which further held that the consent of the prosecutrix having been procured by fraud, was as if no consent had been given, and the fraud being a part of the original scheme, the intent of the defendant was to cause the prosecutrix to be sent out of the State " against her will " within the meaning of section 211 of the Penal Code.

## HELD NOT TO BE KIDNAPPING.

In People v. Merrill (Sup. Ct. 1855), 2 Park. Crim. 590, it was held that an indictment under section 2 Rev. St. 664, section 34, providing that every person who shall sell the labor of any colored person who shall have been kidnapped or inveigled from this State to any other State, place, or country, should be punished by fine or imprisonment or both, was demurrable, inasmuch as the offense named (the sale in another State of a person inveigled or kidnapped from this State) was alleged to have been committed outside the jurisdiction of the court, and it would be a violation of the Constitution of the United States, Article VI and Article IV, section 2, for the court to entertain jurisdiction. This case was reversed on other grounds, in 14 N. Y. 74.

A person is not guilty of kidnapping under the first subdivision of section 211 of the Penal Code who induces another to go out of the State to Yucatan on a promise that he would obtain work for him at a wage of $35 per month American money and board, when the other obtains the work but is only paid $1 per day Mexican money without board. Such a proceeding is a shabby trick, but not a crime. (Distinguishing People v. DeLeon, 109 N. Y. 226). People v. Fitzpatrick, 57 Hun, 459.

In Matter of Marceau, 32 Misc. 217, it was held that, when the prisoner had obtained a divorce from his wife, and was awarded by a competent court the custody of their child, which bore his name and which he was charged with kidnapping, it was impossible for him to be guilty of kidnapping his own child under such circumstances.

In People v. Camp, 139 N. Y. 87, affirming 66 Hun, 531, it was held that where the defendant removed his daughter, of mature years, in broad daylight over public highways and railroads in the presence and view of many people, to a public lunatic asylum within the State, the offense of kidnapping was not committed at common law, as she was

not removed out of the State, nor was it an offense under Penal Code, section 211, as she was not secretly confined within the State, and this, although the defendant knew that his daughter was not insane, and that he used the forms of law from improper and malicious motives. The remedy was by using the writ of habeas corpus or by action for assault and false imprisonment.

### DECISIONS IN OTHER STATES.

When a warrant of arrest issued out of the Superior Court of the County of Yuba is directed generally to any sheriff, constable, marshal or policeman in this State, and is executed by a deputy sheriff of Yuba county (who is also a United States marshal for the district including the counties of Yuba and Nevada) by his arresting the prisoner in Nevada county, and producing him before the Superior judge of Yuba county, the deputy sheriff is not guilty of the crime of kidnapping. Ex parte Sternes, 82 Cal. 245.

A father cannot be indicted under section 94, Act of March 31, 1860, for peaceably obtaining possession of his own child, neither can others who assist him at his request, nor are such persons guilty under the section of a criminal conspiracy, no unlawful means having been used by them. An indictment for conspiracy to kidnap a child under such section is defective which does not disclose the name or sex of the child, that it was under ten years of age, or that the prisoner intended to deprive its parents of the possession of it, or to steal articles from its person. Commonwealth v. Myers, 146 Pa. St. 24.

*Held*, that the crime of kidnapping was not committed when a girl eighteen years of age voluntarily went on a nocturnal buggy ride with the prisoner, a married man, and during the course of the journey she voluntarily committed adultery with him at his request after they had gone into another State, he driving her back to the house where she had lived after an absence of four days and nights. Eberling v. State, 136 Ind. 117.